# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

JUST A Honky Tonk, L.C.    )
           )
     Plaintiff,  )
           )
   v.        )
           )  Civil Action No. 1:25-cv-00717-CMH/WBP
SUSAN OELZE, *et al.*    )
           )
     Defendants. )
————————————————————)

## DEFENDANTS' BRIEF IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION AND RELEVANT FACTS ............................................................1

STANDARD OF REVIEW ...........................................................................................7

ARGUMENT ................................................................................................................7

    I.     Honky Tonk Lacks Standing To Bring Its Lanham Act False Advertising Or Unfair Competition Claims.........................................................7

    II.    Honky Tonk Cannot Establish Likelihood Of Success On The Merits Of Claims. ..........................................................................................10

    III.   Honky Tonk Has Not Suffered—And Will Not Suffer—Irreparable Harm Absent Injunctive Relief; The Reality Is Just The Opposite.................................16

    IV.   Honky Tonk Cannot Establish An Imbalance Of Harms In Its Favor. .................18

    V.    The Public Interest Does Not Favor Injunctive Relief...........................................19

    VI.   The Court Should Require Honky Tonk To Post A Security If The Court Is Disposed To Grant Injunctive Relief. ...............................................20

CONCLUSION........................................................................................................21

## TABLE OF AUTHORITIES

Cases                                                                          Page(s)

*Barcamerica Inter. USA Trust v. Tyfield Importers, Inc.*,
    289 F.3d 589 (9th Cir. 2002) ......................................................................12, 13

*Beach Mart, Inc. v. L&L Wings, Inc.*,
    784 F. App'x. 118 (4th Cir. 2019) ............................................................11, 12, 20

*Belmora LLC v. Bayer Consumer Care AG*,
    819 F.3d 697 (4th Cir. 2016) ...........................................................................7

*Mayson-Dixon Strategic Consulting, LLC v. Mason-Dixon Polling & Strategic
    Consulting, Inc.*,
    324 F. Supp. 3d 569 (D. Md. 2018) ................................................................11, 12

*Direx Israel, Ltd. v. Breakthrough Medical Corp.*,
    952 F.2d 802 (4th Cir. 1991) ...........................................................................17

*District 17, UMWA v. A & M Trucking, Inc.*,
    991 F.2d 108 (4th Cir. 1993) ...........................................................................20

*eBay v. Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006).......................................................................................16

*For Life Products, LLC v. Universal Cos.*,
    Case No. 1:20CV00016, 2021 WL 1169532 (W.D. Va. Mar. 29, 2021) .................8

*FreecycleSunnyvale v. Freecycle Network*,
    626 F.3d 509 (9th Cir. 2010) ......................................................................12, 13, 20

*Grayson O Co. v. Agadir Int'l, LLC*,
    856 F.3d 307 (4th Cir. 2017) ...........................................................................16

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
    174 F.3d 411 (4th Cir. 1999) ...........................................................................20

*JTH Tax LLC v. DM3 Ventures, Inc.*,
    Case No. 3:20-cv-176, 2021 WL 4471597 (E.D. Va. Sept. 29, 2021) .................9

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)....................................................................................7, 8, 9

*Marcotte v. Virginia Beach City Public Schools*,
    No. 2:17-cv-606, 2018 WL 11509748 (E.D. Va. Aug. 24, 2018) .........................16

*Marriott International, Inc. v. Dynasty Marketing Group LLC*,
    Case No. 1:21-cv-610, 2022 WL 20699258 (E.D. Va. Sept. 21, 2022) ................10

*MicroStrategy Inc. v. Motorola*,
  245 F.3d 335 (4th Cir. 2001) ..................................................................7, 19

*Nemet Chevrolet, Ltd. V. Consumeraffiars.com, Inc.*,
  564 F. Supp. 2d 544 (E.D. Va. 2008) .......................................................8

*Northern Virginia Hemp and Agriculture, LLC v. Virginia*,
  125 F.4th 472 (2025).................................................................................7

*PBM Prods., LLC v. Mead Johnson Nutrition Co.*,
  No. 3:09-CV-269, 2009 WL 1684471 (E.D. Va. May 7, 2009) ............19

*Pizzeria Uno Corp. v. Temple*,
  747 F.2d 1522 (4th Cir. 1984) ...............................................................14

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*,
  575 F.3d 342 (4th Cir. 2009) ...................................................................7

*Sarsour v. Trump*,
  245 F. Supp. 3d 719 (E.D. Va. 2017) .............................................6, 7, 17

*Scotts Co. v. United Indus. Corp.*,
  315 F.3d 264 (4th Cir. 2002) .............................................................7, 17

*Shakespeare Co. v. Silstar Corp. of Am.*,
  110 F.3d 234 (4th Cir. 1997) ......................................................14, 15, 17

*Southgate v. Facebook, Inc.*,
  Case No. 1:17-cv-648, 2017 WL 6759867 (E.D. Va. Nov. 14, 2017)............10, 14

*Trustees of Columbia Univ. in City of N.Y. v. NortonLifeLock, Inc.*,
  No. 3:13-cv-808, 2021 WL 8895279 (E.D. Va. Sept. 29, 2021) ............16

*Virginia Polytechnic Inst. and State University v. Hokie Real Estate, Inc.*,
  813 F. Supp. 2d 745 (W.D. Va. 2011) ..................................................8, 9

*Virginia Tech Found. Inc. v. Fam. Grp. Ltd. V*,
  666 F. Supp. 856 (W.D. Va. 1987) .........................................................19

*Wall & Associates, Inc. v. Better Business Bureau of Central Virginia, Inc.*,
  685 F. App'x. 277 (4th Cir. 2017) ...........................................................9

*Wall & Associates, Inc. v. Better Business Bureau of Central Virginia, Inc.*,
  Case No. 1:16-cv-119, 2016 WL 3087055 (E.D. Va. May 31, 2016) ..................7, 8

*Winters v. NRDC, Inc.*,
  555 U.S. 7 (2008)...............................................................................7, 18

*Wudi Industrial (Shanghai) Co. V. Wong*,
    70 F.4th 183 (4th Cir. 2023) .................................................................................16

*Yellow Cab Co. of Charlottsville v. Rocha*,
    No. CIV. A. 3:00CV00013, 2000 WL 1130621 (W.D. Va. July 5, 2000) .......................19, 20

## Statutes

15 U.S.C. § 1114(a) ...............................................................................................10

15 USC § 1125(a) ..................................................................................................10

## Other Authorities

Fed. R. Civ. P. 65 ................................................................................................7, 20

Defendants Susan Oelze ("Oelze") and For A Song, Inc. ("For A Song", collectively, Defendants), hereby oppose the Motion for Preliminary Injunction filed by Plaintiff Just A Honky Tonk, L.C. ("Honky Tonk") and state:

<u>INTRODUCTION AND RELEVANT FACTS</u>

In a new wave song released decades ago, the band Talking Heads warned: "Ah, watch out. You might get what you're after . . . Burning down the house." That appears to be the goal of landowner James Matthews ("Matthews"), whose company, Just A Honky Tonk, L.C. ("Honky Tonk"), is prematurely and preemptively trying to halt critical operations of a going concern business that has operated for more than 57 years, the past 27 of which were spent on property leased to it by Honky Tonk.

Over the course of six decades Gary Oelze created and nurtured what grew into a revered venue for bluegrass, Americana, country, and other live music and variety acts, generating hard-earned goodwill and cultivating the top-notch reputation of the Birchmere with the help of a few longtime, trusted managers. Jimmy Matthews was not one of them, but he now wants this Court's assistance to seize the operations and assets from Gary's widow without paying for them. To do so, he has embarked on a path that is, in essence, burning down the house.

By 1996, Gary already had operated The Birchmere for 30 years and wanted to move it from its second location at 3901 Mt. Vernon Avenue. He turned to restaurateur Ralph Capobianco, who helped him relocate by introducing him to Matthews, a real estate developer. Matthews bought a large, vacant building just down the street from The Birchmere at 3701 Mt. Vernon and worked with Gary to redesign and outfit the building to lease to the music hall and other tenants, including a brewery Matthews planned to open. The music hall space was furnished and equipped with what Gary brought from The Birchmere's second location down the

-1-

street and other secondhand furnishings and equipment Matthews purchased at auction. The
music hall was opened in July of 1997.

On January 23, 1998, Honky Tonk signed a "Lease Agreement" whereby it leased,
retroactive to October 1, 1997, the new location to Gary and Ralph's newly formed operating
company, For A Song. In addition to leasing a part of a building to For A Song, the lease made
reference to the name "Birchmere" and provided that "Time for Good Tunes, Inc. ("TFGT"), the
holder thereof" gave For A Song a right to use the name in conjunction with For A Song's
operation of its "music/entertainment business." Lease Agreement at ¶ 1. Honky Tonk has not
produced proof of an existing registration for the Birchmere mark in Time For Good Tunes' or
Honky Tonk's name at the time the Lease Agreement was signed.

For A Song has now operated The Birchmere successfully at the location for nearly three
decades without oversight or participation of Honky Tonk or Matthews. During all this time,
Honky Tonk was merely a landlord. Cf. Cmplt. at ¶ 3. Sadly, Ralph died in 2010, and Gary
passed away in late January, 2023, leaving leadership of For A Song to Gary's wife, Susan Oelze.

Just two months after Ralph died, Matthews sued his estate in *Just A Honky Tonk, L.C. v.
Estate of Ralph Capobianco,* Case No. CL10003568, in the Circuit Court for the City of
Alexandria (the "Estate Lawsuit"). The Estate removed the lawsuit to this Court (Case No. 1:10-
cv-00936 LMB/TRJ). A copy of the state court Complaint in the Estate Lawsuit was filed as an
Exhibit to the removal petition at ECF 1-1 and is attached hereto as **Exhibit D**.

The story told in the Estate Lawsuit is quite different from that told in this action.
Plaintiff Honky Tonk alleged in the Estate Lawsuit that Matthews and Ralph had originally
"devised an offer to purchase the assets and goodwill of [The Birchmere, reserving] a 5%
ownership interest in the [new] company to [Gary]" and creating a new company to own the

-2-

music hall and real estate that would house it.  **Exhibit D**, Estate Lawsuit at ¶ 8.  Matthews alleged that Plaintiff a Honky Tonk then "purchas[ed] the assets and goodwill of "The Birchmere."  *Id.* at ¶ 9.  For a period of just a few months between June and October 1997 (when For A Song was incorporated[1]), the music hall allegedly was "operated under a company known as Southern Beverage after which "For A Song, Inc." was formed and made lease payments."  *Id.* at 18.  By Matthews' own admission, The Birchmere was never operated by Honky Tonk, and the first task for For A Song's bookkeeper, Barbara Sadar, who began working with For A Song in October of 1997, was to transfer the music hall's accounts from SBI to For A Song.  **Exhibit C**, Declaration of Barbara Sadar (hereafter "Sadar Declaration") at ¶ 8.

Honky Tonk also alleged in the Estate Lawsuit: "After [The Birchmere] became operational in its new facility in June 1997 it became apparent that the management structure established by Matthews and [Gary] was unworkable," and Gary announced that he intended to "resign and leave the area."  **Exhibit D**, Estate Lawsuit at ¶ 12.  The problem, Matthews alleged, was that Gary "could not work with" him.  *Id.* at ¶ 14.  Rather than allow Gary (who was "essential to the business of the venture") to resign, Matthews admits that he agreed to "disassociate himself from the business," and Ralph devised a new scheme for Matthews to lease the property to For A Song, which would  manage the music hall without Matthews' direct involvement.  *Id.* at ¶¶ 14-15.

In stark contrast to the Estate Lawsuit, here Just A Honky Tonk claims its managing member (Matthews) "purchased the assets—including the name—of The Birchmere from Gary Oelze . . ." and then "opened it, *operated it to profitability and then leased it back* to [Gary and

---

[1] **Exhibit A**, Declaration of Susan Oelze (hereafter "Oelze Declaration") at ¶ 6.

Ralph] to operate[,]" providing a "smooth handoff" of a "'turnkey' venue" from Jimmy (Cmplt. ¶ 5; emphasis added). In fact, in the few months that the music hall was open in 1997, and operated by Southern Beverage – the period during which Matthews now claims to have had anything to do with its operations – he managed to alienate its founder and take in only a small fraction of the ticket sales that Gary and Ralph were able to realize in 1998 and thereafter. **Exhibit C**, Sadar Declaration at ¶ 8. Under Gary's independent management, which actually seems to have re-started in October 1997 based on the retroactive lease date, the business was made profitable in 1998 and thereafter. *Id.* To Susan Oelze's knowledge, Matthews and Just A Honky Tonk never participated in the operation of the music hall. **Exhibit A**, Oelze Declaration at ¶ 23.

Consistent with the way Honky Tonk had sued Ralph's estate two months after he died, Honky Tonk initiated an unsuccessful eviction against For A Song two months after Gary's death. Ms. Oelze then started her efforts to negotiate a sale to Honky Tonk of the business her husband and, later over time, she, had worked to build. **Exhibit A**, Oelze Declaration at ¶ 18. For A Song's business assets include decades of goodwill generated by its owners' energy, investments, innovations, and relationships, as well as indispensable personnel, valuable property and equipment, and a dynamic website for reservations and advertising. *Id.* ¶ 24. At the same time, For A Song continued to invest hundreds of thousands of dollars into the venue, and to book shows in the ordinary course of business to maintain the financial integrity of the music hall as a going concern business – as specifically contemplated by a 2001 Lease Addendum between Honky Tonk and For A Song. This was the only way For A Song could maintain The Birchmere's place in a competitive industry, including its reputation and ability to contract upon

-4-

reasonable terms with artists, agents, and others. *Id.* at ¶ 22; **Exhibit B**, Declaration of Michael Jaworek (hereafter "Jaworek Declaration") at ¶¶ 9 & 14-15.

Honky Tonk refused to return For A Song's good faith in negotiations and reeled back its prior offers, and talks between the two companies stalled. Then in December 2024 Honky Tonk demanded that For A Song immediately cease making bookings in the way it always had during what Honky Tonk agreed would be the remaining term of the lease. **Exhibit A**, Oelze Declaration at ¶ 19. Lacking the knowledge, contacts, or apparent will to make its own bookings, Honky Tonk now asks the Court to assign to it all of For A Song's bookings for free and asserts its plan to hire For A Song employees once the lease ends, if not sooner. If For A Song were to halt booking shows eight months before the end of its lease term as Matthews' December 2024 notification had demanded, or now as the preliminary injunction sought by Honky Tonk would require, that it would destroy the value of the going concern business and Birchmere mark by leaving the business without income, patrons, or shows for months on end. *See* **Exhibit B**, Jaworek Declaration at ¶¶ 14-15.

There is no reason for concern that For A Song might mishandle the advances entrusted to it. Gary's practice from the beginning, which is carried on today, is to hold advanced ticket sale funds sacrosanct. **Exhibit C,** Sadar Declaration at ¶ 10. Indeed, the booking of shows and advance ticket sale moneys are not the principal profit-drivers of the venue; in fact, profit is derived largely from the sale of food, alcohol, and merchandise, all of which is driven by the low margin entertainment. **Exhibit A**, Oelze Declaration at ¶ 22; **Exhibit C,** Sadar Declaration at ¶ 11. Therefore, Honky Tonk's insistence that post-August 31 bookings be halted actually threatens to harm the food, alcohol and merchandise concessions which Honky Tonk apparently intends to run by itself once the lease is terminated.

Most importantly, the requested injunction would change the status quo and change and violate express provisions of the lease.  In stark contrast to what Plaintiff is demanding, the Lease Agreement  expressly contemplates that For A Song will to continue to book shows, including shows set on dates falling after any termination of the lease term.  The only apparent purpose of Honky Tonk's demand is to destroy the value of the business to force For A Song to forfeit its assets for nothing.  Indeed, Honky Tonk's strategy of starving the restaurant and concession business of the live entertainment that drives sales would destroy the going concern value of the business and the goodwill of the brand: burning down the house.

When For A Song declined to accede to Matthews' destructive demands, Honky Tonk filed this lawsuit asserting claims for trademark infringement, unfair competition, and false advertising under the Lanham Act; breach of contract; tortious interference with business relations; unjust enrichment, and for a declaratory judgment giving Honky Tonk all of the going concern assets of For A Song, including For A Song's own contracts, bookings, monies and fixtures, furnishings and equipment.  *See generally* Cmplt.  These are assets and rights never given to or owned by Honky Tonk under the lease, which is exactly why Honky Tonk made (paltry) offers to buy them out.  In addition, for reasons included in this brief, Honky Tonk's broader effort to deprive For A Song of the goodwill and the brand value it created over the past 27 years cannot be supported under federal trademark law.  Honky Tonk followed up its complaint with its motion for a preliminary injunction, seeking contract assignments and control over funds despite the absence of any entitlement to this relief under any provision of the lease.

It is very apparent that Honky Tonk does not comprehend the catastrophic impact that the relief *it* seeks will have on the very expectancy it claims to be trying to protect.  This Court

-6-

should deny its ill-considered motion for preliminary injunction and permit For A Song to continue operating per the terms of its lease to preserve The Birchmere as a going concern.

## STANDARD OF REVIEW

A preliminary injunction "involv[es] the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017) (quoting *MicroStrategy Inc. v. Motorola*, 245 F.3d 335, 339 (4th Cir. 2001)). In order to obtain the "extraordinary remed[y]" it seeks, Honky Tonk must meet the high burden of demonstrating that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent relief; (3) the balance of equities weighs in its favor; and (4) a preliminary injunction is in the public interest. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 (4th Cir. 2002); *Winters v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *see also* Fed. R. Civ. P. 65(a). As discussed more fully below, Honky Tonk cannot establish any one of the relevant factors, mandating denial of its motion for preliminary injunction. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part*, 607 F.3d 355 (4th Cir. 2010).

## ARGUMENT

### I.    Honky Tonk Lacks Standing To Bring Its Lanham Act False Advertising Or Unfair Competition Claims.

As a threshold matter, Honky Tonk does not have standing to bring its Lanham Act claims (Counts II & III). "Before addressing whether the plaintif[f] made a clear showing of likelihood of success on the merits," the court "must address the threshold question of standing." *Northern Virginia Hemp and Agriculture, LLC v. Virginia*, 125 F.4th 472, 489 (2025). To establish standing, a plaintiff must plead that it suffered an injury to a commercial interest in sales or business reputation that was proximately caused by the defendant. *Lexmark Intern., Inc.*

*v. Static Control Components, Inc.*, 572 U.S. 118, 131–32 (2014); *c.f. Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 709 (4th Cir. 2016) (applying *Lexmark* to an unfair competition claim); *see Wall & Associates, Inc. v. Better Business Bureau of Central Virginia, Inc.*, Case No. 1:16-cv-119, 2016 WL 3087055, at *1 (E.D. Va. May 31, 2016), *aff'd* 685 F. App'x 277 (4th Cir. 2017).

Here, Honky Tonk does not – and it cannot – identify any actual injury to a commercial interest or injury to its reputation. *Lexmark*, 572 U.S. at 131–32. Honky Tonk has not alleged any actual "lost sales" or any facts showing "that harm to [Plaintiff's] reputation has occurred or will imminently occur." *For Life Products, LLC v. Universal Cos.*, Case No. 1:20CV00016, 2021 WL 1169532, at *3–4 (W.D. Va. Mar. 29, 2021) (dismissing Lanham Act false advertising claim for lack of standing). It cannot do so because apart from its business as a landlord, it cannot show that it has any established business or reputation for providing live music and entertainment on the Birchmere property that it rents to For A Song. Nor can Honky Tonk demonstrate that it is a competitor of Susan Oelze or For A Song. **Exhibit A**, Oelze Declaration at ¶ 23.

For A Song's actions have "nothing to do with compet[ing] products and the ability of consumers to distinguish between them," *Nemet Chevrolet, Ltd. V. Consumeraffiars.com, Inc.*, 564 F. Supp. 2d 544, 552–53 (E.D. Va. 2008) (emphasis in original), because neither Susan Oelze nor For A Song is booking shows under the Birchmere name at some other venue to compete with Honky Tonk. *See generally* Cmplt.; **Exhibit A**, Oelze Declaration at ¶ 23. Should it assume operations, Honky Tonk remains able to book different (or any) shows unaffected by the For A Song's actions. *Id.* And Honky Tonk itself has condoned For A Song's bookings by insisting that For A Song transfer those bookings to Honky Tonk so that it may "continue

-8-

operating . . . as a live music venue" with the same "long-term employees" who currently work there—a far cry from the "competitive business injury" it must show. *Virginia Polytechnic Inst. and State University v. Hokie Real Estate, Inc.*, 813 F. Supp. 2d 745, 757 (W.D. Va. 2011); Cmplt. ¶ 41; Lease Addendum.

Nor can Honky Tonk demonstrate any injury that was proximately caused by either defendant. *Lexmark*, 572 U.S. at 131–32; *JTH Tax LLC v. DM3 Ventures, Inc.*, Case No. 3:20-cv-176, 2021 WL 4471597, at *9 (E.D. Va. Sept. 29, 2021) (dismissing trademark infringement claims against company officer where JHT failed to allege specific facts showing personal wrongdoing). As the Supreme Court noted in *Lexmark*, "a plaintiff who does not compete with the defendant will often have a harder time establishing proximate causation." 572 U.S. at 136. Here, Honky Tonk cannot identify any harm that "flows directly" from the conduct it complains of, *Lexmark*, 572 U.S. at 138, nor can it identify "a single consumer who withheld or cancelled business with it or . . . a particular quantum of diverted sales or loss of goodwill and reputation," *Wall & Associates, Inc. v. Better Business Bureau of Central Virginia, Inc.*, 685 F. App'x. 277, 279 (4th Cir. 2017) (affirming dismissal of Lanham Act claim for lack of standing).

And because Ms. Oelze does not oversee, direct, supervise, or approve the bookings made by For A Song's long-time booking agent, Honky Tonk cannot point to any actions by Ms. Oelze that directly or proximately caused Honky Tonk a specific harm. *See DM3 Ventures, Inc.*, 2021 WL 4471597, at *9 (dismissing trademark infringement claims against officer even where plaintiff alleged offer "instructed and direct[ed]" company to commit an infringing act); *see generally* Cmplt.; Jarowek Decl. ¶¶ 10–11. As a result, Honky Tonk cannot "adequately allege the necessary proximate cause between its alleged injury and Defendants' allegedly violative conduct." *Wall & Associates, Inc.*, 685 F. App'x. at 279. Accordingly, Honky Tonk lacks

standing to assert its Lanham Act advertising and unfair competition claims, and the Court

should dismiss those claims.[2]

## II.    Honky Tonk Cannot Establish Likelihood Of Success On The Merits Of Claims.

### A.    Honk Tonk Cannot Establish Likelihood Of Success On The Merits Of Its Trademark Infringement And Unfair Competition Claims.

Even if Honky Tonk had standing for its Lanham Act claims – it plainly does not – it is

unlikely to succeed on the merits of its trademark infringement and unfair competition claims.

To prevail on a claim for trademark infringement (Count I) or unfair competition (Count II)

under the Lanham Act, a plaintiff must show that it "owns a valid trademark"; that the

"defendant used the mark in commerce without plaintiff's authorization" in connection with the

sale of goods or services; and that "the defendant's use of the mark is likely to confuse

customers."  *Southgate v. Facebook, Inc.*, Case No. 1:17-cv-648, 2017 WL 6759867, at *3 (E.D.

Va. Nov. 14, 2017); *Marriott International, Inc. v. Dynasty Marketing Group LLC*, Case No.

1:21-cv-610, 2022 WL 20699258, at *6 (E.D. Va. Sept. 21, 2022) ("The elements for unfair

competition are identical to trademark infringement under the Lanham Act."); *see* 15 USC

§ 1125(a); 15 U.S.C. § 1114(a).  Honky Tonk cannot establish any of these elements.

### i.    The Lease Expressly Authorizes What Plaintiff Would Have the Court Prohibit.

The parties' Lease Addendum expressly authorizes For A Song to use the Birchmere mark

as alleged in the Complaint.  Prior to the expiration of the 1998 Lease Agreement, Honky Tonk

and For A Song signed a two-page addendum.   ECF 1-2 at 23, ("Lease Addendum") at 1.  The

Lease Addendum explicitly addressed how the parties would handle bookings at the end of the

---

[2]  Defendants contemporaneously have moved to dismiss Plaintiff's Complaint for lack of standing and failure to state a claim upon which relief can be granted by this Court.

lease, providing that "the personal guarantees set forth in the lease and below shall guarantee both the lease payments and all monies owed by Tenant upon termination of the lease for any cause . . . including but not limited to . . . *advances on acts which are scheduled to play on a date after the termination date*." Lease Addendum ¶ 5 (emphasis added). (The "advances" are understood in the industry to be advance ticket sale revenues, which For A Song holds in reserve in case ticket purchases have to be refunded to patrons for any reason.) **Exhibit C**, Sadar Declaration at ¶ 10. Thus, the Lease Addendum expressly contemplated that For A Song would continue to book shows through the end of the lease, even if the dates of those shows would fall after the lease ended – which of course it would have to if it were to remain a going concern business.

### ii. The Birchmere Mark Was Abandoned When Honky Tonk Engaged In Naked Licensing.

Honky Tonk also cannot establish the validity of the mark because at best, its Lease represents little more than a naked licensing arrangement[3] with For A Song, in which Honky Tonk itself did not own the mark to which rights were being assigned, and both Honky Tonk and the owner "fail[ed] to exercise adequate quality control over the licensee." *Beach Mart, Inc. v. L&L Wings, Inc.*, 784 F. App'x. 118, 127 (4th Cir. 2019); *c.f. Mayson-Dixon Strategic Consulting, LLC v. Mason-Dixon Polling & Strategic Consulting, Inc.*, 324 F. Supp. 3d 569,

---

[3] Honky Tonk fails to explain how Time for Good Tunes could have maintained a licensor/ licensee relationship with For A Song despite not being a party to any term of the Lease apart from the right to use the Birchmere name. *See* Lease, at 1. Instead, Honky Tonk baldly asserts in a declaration by Jimmy Matthews (Exhibit A to its Motion for Preliminary Injunction) that at some unspecified time after the Lease was executed "Honky Tonk subsequently acquired all of [Time for Good Tunes]'s assets, including The Birchmere mark." Honky Tonk provides no substantiating documentation supporting this alleged transfer. *See* ECF No. 11-1, Declaration of James J. Matthews ("Matthews Decl.") ECF No. 11-1, ¶ 5. Thus, the licensing relationship between the purported owner of the mark and For A Song has not been clearly established, nor has Honky Tonk established its authority to grant or deny use of The Birchmere mark.

575-76 (D. Md. 2018) (recognizing abandonment as a defense "to contest the ownership and validity of a trademark"). When the owner of a trademark fails to exercise control over any license – as clearly occurred here – the trademark "stop[s] functioning as a symbol of quality" and is therefore "abandoned." *Beach Mart, Inc.*, 784 F. App'x. at 127; *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 516 (9th Cir. 2010) (explaining "naked licensing is *inherently deceptive* and constitutes abandonment of any rights to the trademark by the licensor"); *Barcamerica Inter. USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 596–97 (9th Cir. 2002) (emphasis in original).

To determine whether an applicant has engaged in naked licensing, courts consider three factors: (1) "whether the license contained an express contractual right to inspect and supervise the licensee's operations"; (2) whether the licensor maintained "actual control" of the quality of the trademark's use; or (3) whether the trademark owner reasonably relied on the licensee to maintain quality through a "close working relationship" with the licensee. *FreecycleSunnyvale*, 626 F.3d at 516–18.

Here, Honky Tonk's Lease clearly represents at most a naked licensing arrangement for the mark that resulted in the abandonment of any claimed trademark ownership. In the original Lease, which purported to give For A Song a non-exclusive license for The Birchmere mark, neither Time For Good Tunes (the purported holder of rights in the mark) nor Honky Tonk maintained any express contractual right to supervise how For A Song used the mark. *See* ECF No. 1-2. Instead, the Lease Agreement simply stated that Time for Good Tunes granted a "non-exclusive right to use the name 'Birchmere,' or 'Birchmere, Inc.' in conjunction with the music/entertainment business at the Music Hall at the Birchmere." Lease Agreement ¶¶ 1 & 44. And while the Lease Agreement contains some terms related to how For A Song was to maintain

-12-

the building it was renting, it contains no similar provisions related to how it was or was not to use the name Birchmere. *See generally* Cmplt.; *FreecycleSunnyvale*, 626 F.3d at 516.

Moreover, the original lease term expired in 2003, and while it was further extended by the Addendum for an additional ten years, *see* ECF No. 1-2, the Addendum contained no additional provisions relating to use of the name. Significantly, the Addendum was not even signed by Time For Good Tunes, the purported holder of the rights in the mark. *See* Addendum. Nonetheless, Honky Tonk has admitted that For A Song's use of the mark is governed by the terms of the Lease and Addendum and continued and will continue at least until August 31, 2025. Matthews Decl. ¶ 7. However, there is no provision in any document of record showing any right of either Time For Good Tunes or Honky Tonk to maintain "actual control" or a "close working relationship" with For A Song that would have ensured For A Song was "maintaining the consistency of the trademarks." *FreecycleSunnyvale*, 626 F.3d at 516–18. Instead, Honky Tonk simply turned operation of the Birchmere over to "Gary Oelze and Ralph Capobianco to operate." Cmplt. ¶ 5. Indeed, Honky Tonk had so little to do with the Birchmere operations that Matthews does not know if, how, or when shows are booked. *See, e.g.*, Cmplt. ¶ 29; **Exhibit B**, Jaworek Decl. ¶ 12. Honky Tonk never has "directed, initiated, reviewed, or approved any of the bookings" made by For A Song's long-time booking agent. *Id.* ¶ 12; **Exhibit C,** Sadar Declaration at ¶ 9. That is exactly the lack of quality control that courts have held results in the abandonment of a trademark. *FreecycleSunnyvale*, 626 F.3d at 517–18; *Barcamerica*, 289 F.3d at 596–97.

      **iii.**    **Honky Tonk Cannot Point To Any Confusion Caused By For A Song's Authorized Use Of The Mark.**

Even if Honky Tonk had not abandoned the mark—and the facts establish that it has—it cannot show any likelihood of confusion caused by For A Song's continued booking of acts at

the Birchmere venue.  *Southgate v. Facebook, Inc.*, Case No. 1:17-cv-648, 2017 WL 6759867, at

*3 (E.D. Va. Nov. 14, 2017).  To determine whether likelihood of confusion exists, courts

examine a multitude of factors including (1) the strength or distinctiveness of the plaintiff's mark,

(2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that

the marks identify; (4) the similarity of the facilities used by the holder of the marks; (5) the

similarity of advertising used by the holder of the marks; (6) the defendant's intent; and (7) actual

confusion.  *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984).  Not every factor

must be considered and no single factor is dispositive.  *Id.*

Here, the first five factors weigh against Honky Tonk because Honky Tonk is alleging

Defendants are using the same mark, The Birchmere, within the same music and entertainment

industry, to book and host musical acts and entice audiences to purchase tickets for such acts.

But Honk Tonk has failed to identify a single customer, vendor, or third-party artist that has been

confused by For A Song continuing to book acts at the Birchmere.  Cmplt. ¶ 71.  Despite Honky

Tonk's hyperbolic mischaracterizations, For A Song has continued to book shows in the same

manner it has been doing for the last twenty-eight years.  **Exhibit B**, Jaworek Decl. ¶¶ 2 & 8.

And "a likelihood of confusion should not be inferred . . . if the actor acted in good faith under

circumstances that do not otherwise indicate an intent to cause confusion or to deceive."

*Shakespeare Co. v. Silstar Corp. of Am.*, 110 F.3d 234, 239 (4th Cir. 1997) (citing Restatement

(Third) of Unfair Competition, § 22(2) (1995)).  The bookings are made at The Birchmere venue,

and Defendants have not transferred—and they do not intend to transfer—these acts to a

different venue upon termination of the lease.  **Exhibit A**, Oelze Declaration at ¶¶ 21-23.  No

risk of the fictional "dueling Bichmeres" scenario forecasted by Honky Tonk exists or has been

shown to be likely to exist.  Matthews Decl. ¶ 11.

-14-

Patrons buying tickets for Birchmere shows booked beyond August 31, 2025, are similarly unaffected by the termination of the parties' Lease.  The party responsible for operating the venue will not affect the act booked, nor the location, date, and time of the tickets purchased for each act.  *See* **Exhibit A**, Oelze Declaration at ¶¶ 21-23.  As is consistent with its longstanding practice, For A Song has maintained the account holding ticket sale proceeds for acts post August 31, 2025, as one would in an escrow account.  **Exhibit C**, Sadar Declaration at ¶ 10.  And because the booking of shows drives restaurant and merchandise sales and profits, Honky Tonk stands to receive all of the benefit and make all of the profit from For A Song's efforts without paying anything.  *See id.* at ¶ 11.  In short, For A Song is not booking acts beyond its termination date for some nefarious competitive purpose, but rather out of a good faith concern for maintaining the goodwill of The Birchmere's reputation, and Susan Oelze herself is not booking any acts at all.  **Exhibit A**, Oelze Declaration at ¶ 23; *Shakespeare Co.*, 110 F.3d at 239.  To the extent that Honky Tonk claims that confusion is likely to result from its insistence that For A Song cease its booking activity—that confusion is a self-inflicted harm caused by Honky Tonk, resulting in booked acts reaching out to inquire about the status of their bookings and future acts being disrupted.  *See* **Exhibit B**, Jaworek Decl. ¶¶ 13–15.

Because the purported owner of the mark failed to exercise any control over how For A Song used the mark, it cannot have enforceable rights in the mark, and Honky Tonk cannot point to any confusion resulting from *Defendants'* actions.  For those reasons, Honky Tonk cannot establish likelihood of success on the merits on its trademark infringement or unfair competition claims.

**B.    Honky Tonk's Other Claims Are Waived.**

Honky Tonk has failed to meet its "high" burden on the remaining five counts (Counts III–VII) because it does not address them in its opening brief.  It has thus waived these

-15-

arguments.[4]  A party waives an argument "by failing to present it in its opening brief or by failing to develop [its] argument – even if [its] brief takes a passing shot at the issue." *Grayson O Co. v. Agadir Int'l, LLC*, 856 F.3d 307, 316 (4th Cir. 2017).  Honky Tonk neither referenced nor developed its success of likelihood on the merits arguments for Counts III–VII in its opening brief and therefore waived any argument related to these claims.  *Id.*; *see generally* ECF No. 9.

Even if it had not waived any arguments relating to the five other claims in its complaint—it has—Honky Tonk cannot show the likelihood of success on the merits on any of these claims for the reasons explained in Defendants' Motion to Dismiss, filed contemporaneously herewith.

### III.    Honky Tonk Has Not Suffered—And Will Not Suffer—Irreparable Harm Absent Injunctive Relief; The Reality Is Just The Opposite.

Honky Tonk has not established the irreparable harm necessary to justify extraordinary injunctive relief.  In light of the Supreme Court's decision in *eBay v. Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006), there is no presumption of irreparable injury even if likelihood of confusion is demonstrated.  *See Wudi Industrial (Shanghai) Co. V. Wong*, 70 F.4th 183, 190 (4th Cir. 2023) (remanding to district court to determine whether party moving for injunction can show (1) that it has suffered irreparable harm; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction).  The irreparable

---

[4]  Nor can Honky Tonk now raise these arguments for the first time in its reply brief.  Indeed, courts generally "disregard those new arguments raised for the first time in a reply brief," *Trustees of Columbia Univ. in City of N.Y. v. NortonLifeLock, Inc.*, No. 3:13-cv-808, 2021 WL 8895279, at *1 & n.1 (E.D. Va. Sept. 29, 2021), lest they "risk improvident or ill-advised opinions on the legal issues raised," *Marcotte v. Virginia Beach City Public Schools*, No. 2:17-cv-606, 2018 WL 11509748, at *7 n.3 (E.D. Va. Aug. 24, 2018).

harm alleged by plaintiff must be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 812 (4th Cir. 1991), *abrogation recognized on other grounds, Sarsour*, 245 F. Supp. 3d at 719, n.6.

Here, Honky Tonk cannot establish likelihood of confusion arising from For A Song's actions that would cause any irreparable injury.  For A Song's actions are not causing confusion among artists and ticket purchasers.  *See supra* Section II.A.iii.  Defendants are acting out of a good faith concern of maintaining the "invaluable goodwill" of The Birchmere's reputation. Matthews Decl. ¶ 9; **Exhibit A**, Oelze Declaration at ¶¶ 21-22; *Shakespeare Co.*, 110 F.3d at 239. And Honky Tonk cannot show any actual and imminent confusion resulting from For A Song's good-faith bookings.  *Direx Israel, Ltd.*, 952 F.2d at 812.  To the contrary, Honky Tonk's own actions are the cause of any confusion and harm of which it now complains.  Enjoining For A Song from continuing booking will irreparably harm "The Birchmere's business and reputation." **Exhibit B**, Jaworek Decl. ¶ 16.  Artists and ticket purchasers will be "actively misle[d]." Matthews Decl. ¶ 11; *see* **Exhibit B**, Jaworek Decl. ¶¶ 13 & 15.  In fact, since May 1, 2025, the *cessation* of booking—insisted upon by Honky Tonk—has already "inconvenienced artists' representatives['] attempts to lock down tour dates," "delayed" offers, and caused "confusion and concern among the agents for musical acts . . . already . . . booked for shows after August 31, 2025."  **Exhibit B**, Jaworek Decl. ¶¶ 13 & 15.  Granting an injunction furthering the booking moratorium would only compound, not rectify, this harm.  *See Scotts Co.*, 315 F.3d at 272 (stating the element of irreparable harm must be found "*absent* relief") (emphasis added).  The "loss of credibility and damage to the reputation" of the Birchmere, Matthews Decl. ¶ 12, will only result from "ceasing bookings beyond August 31, 2025" as "[w]ithout acts . . . the music hall will cease to function after a time," **Exhibit B,** Jaworek Decl. ¶ 14.  Injunctive relief against

-17-

Defendants would not protect against such harm.  Honky Tonk has not established—and it cannot establish—any irreparable harm caused by defendants that would be remedied by this Court's grant of a preliminary injunction.

## IV.    Honky Tonk Cannot Establish An Imbalance Of Harms In Its Favor.

The balance of hardships does not support preliminary relief in this case.  In considering the equities between the parties, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the relief requested." *Winter*, 555 U.S. at 24.  Issuing an injunction will harm both For A Song and Honky Tonk.  As discussed, Honky Tonk is not facing an imminent threat posed by For A Song's continued bookings past August 31, 2025.  *See supra* Section III.  In making these bookings, For A Song is operating pursuant to the provisions of the current Lease arrangement while preserving the goodwill value of The Birchmere mark—its "most valuable asset."  Matthews Decl. ¶ 12.  Susan Oelze herself has nothing personally to do with these bookings.  **Exhibit A,** Oelze Decl. ¶ 23; **Exhibit B,** Jaworek Decl. ¶¶ 10-12.   Honky Tonk will not be harmed by the For a Song's efforts to protect the value of The Birchmere business as a going concern.  In fact, quite the opposite.  Upon termination of the lease—a reality that Defendants do not contest will occur on August 31, 2025—Honky Tonk will receive value from the bookings that have been made provided it operates a music and entertainment site on the currently leased premises.  *See* **Exhibit A,** Oelze Decl. ¶ 23.

Honky Tonk's contention that Defendants' harm is self-inflicted is misplaced.  Honky Tonk itself is causing the very harm to The Birchmere mark of which it complains by demanding that For A Song cease booking acts past August 31, 2025.  *See supra* Section III.  Defendants' actions are not infringing upon The Birchmere trademark: even if Honky Tonk can demonstrate that it owns a valid mark over which it exercises sufficient control and that it properly has

-18-

licensed that mark to For A Song, then For A Song maintains a non-exclusive license to the mark until the termination of the Lease—which has yet to pass – and nothing in the Lease prohibits For A Song from continuing to use the mark in this manner until that date.  Injunctive relief would harm For A Song and Honky Tonk alike.  Honky Tonk cannot show an "imbalance of hardship in [its] favor" because the "plight of [For A Song] is not substantially different from that of" Honky Tonk.  *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (refusing to grant an injunction if it "would cause at least as much harm to the defendant . . . as its denial would to the plaintiff"); *Virginia Tech Found. Inc. v. Fam. Grp. Ltd. V*, 666 F. Supp. 856, 860 (W.D. Va. 1987) (refusing to grant a preliminary injunction for plaintiff because "it would, in effect, have prevailed on the underlying lawsuit without ever having had to try it").  Preventing For A Song from booking acts would hurt Defendants' current interest and value in the mark and impact the future goodwill value of the mark if and when Honky Tonk receives it.

Therefore, Honky Tonk's request for injunctive relief should be denied.

## V.    The Public Interest Does Not Favor Injunctive Relief.

Issuing injunctive relief against For A Song is not in the public interest. Honky Tonk points to the public interest of "eliminating confusion" ostensibly caused by violations of the Lanham Act but it has failed utterly to establish that this public interest is at risk.  *See supra* Section II.A.iii; *PBM Prods., LLC v. Mead Johnson Nutrition Co.*, No. 3:09-CV-269, 2009 WL 1684471, at *6 (E.D. Va. May 7, 2009).  Rather, issuing an injunction against Defendants will only cause the very harm Honky Tonk claims it seeks to protect against.  *Yellow Cab Co. of Charlottsville v. Rocha*, No. CIV. A. 3:00CV00013, 2000 WL 1130621, at *9 (W.D. Va. July 5, 2000) (denying a preliminary injunction when "the public does not appear to be suffering any irreparable harm at present").  Defendants' actions are not causing consumer confusion.  *See supra* at Section II.A.iii.  Entry of this injunction would conversely harm the public by

-19-

"depriv[ing] them of [For A Song's] legitimate services pending the litigation." *Yellow Cab Co.*, 2000 WL 1130621, at *9 ("The public interest in fair trade and competition will not be unduly compromised if a preliminary injunction does not issue in this case."). Moreover, giving Honky Tonk control over the mark when it never has exercised control over the quality of goods and services on which For A Song has used the mark would mislead and deceive the public. *FreecycleSunnyvale*, 626 F.3d at 516 (explaining "naked licensing is *inherently deceptive*") (emphasis in original); *Beach Mart, Inc.*, 784 F. App'x. at 127 (stating "uncontrolled licensing may cause the trademark to stop functioning as a symbol of quality and a controlled source"). The Court should "preserv[e] the status quo" and deny Honky Tonk's request for a preliminary injunction under these circumstances. *Id.*

## VI.    The Court Should Require Honky Tonk To Post A Security If The Court Is Disposed To Grant Injunctive Relief.

Should the Court proceed with the issuance of a preliminary injunction against Defendants on this record, then Honky Tonk should be required to post security. Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, "[a] district court *must* fix a bond whenever it grants a preliminary injunction or restraining order." *See also Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999) (emphasis added). While the court has discretion as to the amount of the security, "it is not free to disregard the bond requirement altogether." *Id.* In fact, Honky Tonk's request would result in "reversible error." *District 17, UMWA v. A & M Trucking, Inc.*, 991 F.2d 108, 110 (4th Cir. 1993) (reversing for failure to set a security when granting a preliminary injunction). And a nominal security would not "suffice" here, *Hoechst Diafoil Co.*, 174 F.3d at 421 n.3, because an injunction would restrain For A Song from lawfully acting pursuant to the Lease and Addendum. Lease Addendum ¶ 5.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, Defendants respectfully request that Honky Tonk's motion for preliminary injunctive relief be denied and that the Court award such additional relief as it deems fair and reasonable.

Respectfully submitted,
*/s/ Lauri E. Cleary*
Lauri E. Cleary
Raymond J. Sherbill (*pro hac vice forthcoming*)
Lerch, Early & Brewer, Chtd.
7600 Wisconsin Avenue, Suite 700
Bethesda, MD 20814
Telephone: 301-657-0176
lecleary@lerchearly.com
rjsherbill@lerchearly.com

Steven P. Hollman (*pro hac vice forthcoming*)
Hannah Wigger, VSB No. 100118
Tifenn Drouaud (*pro hac vice forthcoming*)
SHEPPARD MULLIN RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006
Telephone: 202-747-1900
shollman@sheppardmullin.com
hwigger@sheppardmullin.com
tdrouaud@sheppardmullin.com

*Counsel for Defendants Susan Oelze and For A Song, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which will send notification of such filing on all counsel of record on May 27, 2025.

*/s/ Lauri E. Cleary*
Lauri E. Cleary